**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
　　　*Plaintiff-Appellant,*

v.

MAURICE NORMAN DICKEY-BEY,
　　　*Defendant-Appellee.*

No. 04-4265

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Andre M. Davis, District Judge.
(CR-03-463-AMD)

Argued: October 29, 2004

Decided: December 29, 2004

Before NIEMEYER and LUTTIG, Circuit Judges,
and HAMILTON, Senior Circuit Judge.

---

Reversed and remanded by published opinion. Judge Niemeyer wrote
the opinion, in which Judge Luttig and Senior Judge Hamilton joined.

---

## COUNSEL

**ARGUED:** James Thomas Wallner, Special Assistant United States
Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Balti-
more, Maryland, for Appellant. Kenneth Wendell Ravenell, SCHUL-
MAN, TREEM, KAMINKOW & GILDEN, P.A., Baltimore,
Maryland, for Appellee. **ON BRIEF:** Thomas M. DiBiagio, United
States Attorney, Baltimore, Maryland, for Appellant.

**OPINION**

NIEMEYER, Circuit Judge:

Police arrested Maurice Dickey-Bey without a warrant after Dickey-Bey picked up a sealed package at Mail Boxes Etc. in Towson, Maryland, and exited from the store. Police knew before Dickey-Bey retrieved the package that it contained two kilograms of cocaine. Following the arrest, officers searched Dickey-Bey's automobile, which was approximately 30 feet away, and discovered rental receipts and keys for other mailboxes to which other packages, also known by police to contain cocaine, had been sent.

On Dickey-Bey's motion to suppress the evidence seized from his vehicle, the district court concluded that police did not have probable cause to believe that Dickey-Bey knew that the package contained cocaine and that, therefore, the police did not have probable cause for his arrest and for the search. The court also concluded that even if probable cause for the arrest existed, the search of Dickey-Bey's vehicle was not a valid search incident to an arrest. It reasoned that Dickey-Bey's "association with the vehicle was too attenuated at the time of the arrest to support application of the [*New York v.*] *Belton* bright-line rule," which holds that the passenger compartment of a motor vehicle may be searched incident to the lawful custodial arrest of an occupant. *See New York v. Belton*, 453 U.S. 454, 460-61 (1981).

Based on the totality of the facts found by the district court, we conclude, as a matter of law, that the police officers had probable cause to believe that Dickey-Bey was knowingly possessing cocaine and that the police officers had independent probable cause to believe that Dickey-Bey's automobile was being used as an instrumentality of a crime. Accordingly, we reverse the district court's suppression order and remand for further proceedings.

I

Law enforcement officials in Los Angeles notified Sergeant John Campbell of the Maryland State Police Package Drug Interdiction Unit on September 23, 2003, that three packages would be arriving

in the Baltimore area by overnight delivery service from The UPS Store in Culver City, California, and that the packages were thought to contain cocaine. The Los Angeles officers told Campbell that a drug-detecting dog had "alerted positive" to the packages; that the packages had the same return address; and that they were addressed variously to Baltimore-area UPS and Mail Boxes Etc. retail stores,[1] including one addressed to "Special Design at Box 187, Mail Boxes Etc., 727 Dulaney Valley Road, Towson, Maryland."

The next morning, September 24, members of the Maryland State Police Package Drug Interdiction Unit intercepted the three suspected packages at two Baltimore-area UPS distribution facilities. At that time, they also discovered a fourth package similarly addressed and marked with the same return address. All four packages were scanned by a drug-detecting dog, and in each case the dog alerted positive, indicating the presence of a controlled substance.

With this information, the Maryland State Police obtained a search warrant to open and search the four packages. In each package, the officers found four large plastic tubs of hair gel — consistent with the hair care theme indicated by the addressees' names, such as "Natural Feels" and "Special Design" — and in each tub they found one plastic-wrapped block of cocaine weighing approximately one-half kilogram. The four packages thus contained in the aggregate approximately eight kilograms of cocaine, having a street value of approximately $200,000.

The officers resealed the packages and transported them to the addressee mailboxes for pickup. They also enlisted the assistance of Baltimore City, Baltimore County, and Anne Arundel County police to surveil each retail location. Maryland State and Baltimore County police officers arrived at the Mail Boxes Etc. store on Dulaney Valley Road at approximately 11:00 a.m. to stake out that location. Corporal Chad Hymel of the Maryland State Police delivered the package addressed to that location to undercover Baltimore County Police Officer Douglas Kriete, who was to act as a Mail Boxes Etc. employee. Officer Kriete briefed the Mail Boxes Etc. employees on

---

[1]In 2001, UPS purchased Mail Boxes Etc., and some Mail Boxes Etc. locations have been renamed The UPS Store.

duty, and one employee advised Officer Kriete that Box 187 was rented to "Lisa Ruiz," with a business name "Special Design," and that the individual who customarily retrieved mail from Box 187 was "a black male of average height, about 5'8" or 5'9", with a heavy build," who usually wore some type of uniform shirt or jacket. Officer Kriete communicated this description to the surveilling officers outside the store. He also told the other officers that he would not exit the store unless an individual had accepted the package and was walking out: "Unless I come out of that building," Officer Kriete said, "there was nobody to be arrested or nobody to be stopped." Officer Kriete then assumed his role as a Mail Boxes Etc. employee.

At approximately 11:30 a.m., Baltimore County Detective Brian Martin observed a brown Dodge Daytona automobile pull into the Mail Boxes Etc. parking lot and back into a parking space. In the context of anticipating the arrival of someone who would make a drug pickup, Detective Martin found this conduct suspicious. All other vehicles in the parking lot had pulled in front-first, and a customer would have had to go out of his way to back into a parking space given the layout of the lot. The person who exited the automobile also fit the description of the person who customarily had picked up packages from Box 187. In addition, Detective Martin observed that the person looked around the parking lot before approaching the store. Detective Martin communicated over the radio to the other officers that the person who had exited the brown vehicle matched the description given by the Mail Boxes Etc. employee and was about to enter the store.

As the suspect, who was later identified to be Dickey-Bey, entered the store, the Mail Boxes Etc. employee identified Dickey-Bey to Officer Kriete as the one who had customarily come to pick up packages from Box 187. Dickey-Bey approached the mailbox area and asked for "any mail" in his box, and he was handed the package addressed to "Special Design" at that box. Moments later, he exited the store, with Officer Kriete following him. Upon hearing the screeching wheels of approaching police cars, Officer Kriete placed Dickey-Bey on the ground and under arrest. The officers variously testified that Dickey-Bey was arrested approximately three to five feet from the brown automobile in which he had arrived. An employee of Mail Boxes Etc., however, testified that Dickey-Bey had not gotten

that far and was still on the sidewalk when he was arrested, approximately 30 feet from his vehicle.

After Dickey-Bey was secured, Detective Martin told the other officers that Dickey-Bey had "arrived, parked, and exited the brown vehicle that was backed into the spot." Approximately 15 minutes after Dickey-Bey was first placed on the ground, the officers proceeded to search the automobile and discovered folded-up rental contracts and corresponding keys for various mailboxes at other UPS retail stores, matching perfectly the addresses on the four recovered packages. All of the contracts were in the name of "Lisa Ruiz." Officers also discovered a contract and key to a fifth mailbox that was later found to contain a fifth package of hair-gel tubs packed with two kilograms of cocaine.

Dickey-Bey was indicted for possession with intent to distribute "5 kilograms or more of a mixture or substance containing a detectable amount of cocaine" and for conspiracy to distribute five kilograms or more of cocaine. After pleading not guilty, he filed a motion to suppress "any and all evidence seized as a result of the illegal search of the defendant's 1989 Dodge Daytona" automobile.

Following a lengthy hearing on March 29, 2004, at which six witnesses testified, the district court issued an order from the bench granting Dickey-Bey's motion to suppress. The court concluded that there had been no probable cause to arrest Dickey-Bey and that the search of Dickey-Bey's automobile had been illegal. Considering first whether the officers had probable cause to arrest Dickey-Bey, the district court excluded from its consideration Detective Martin's observations of Dickey-Bey's arrival at the parking lot, including his backing into a parking space and looking around before entering the Mail Boxes Etc. store, noting that this information was not communicated to Detective Kriete before Kriete placed Dickey-Bey under arrest. Taking into account the remaining evidence, the court concluded that the officers did not have probable cause to believe that Dickey-Bey knew the package he picked up at the Mail Boxes Etc. contained cocaine. In addition, the court concluded that even if there was probable cause to support the arrest, the search of Dickey-Bey's automobile was too attenuated to be a valid search incident to arrest. Refusing to credit police officer testimony that Dickey-Bey was

arrested within three to five feet of his automobile, the court found that he was arrested "some 30 feet or more away" and that a vehicle at that distance could not be searched incident to arrest.

The government filed this interlocutory appeal challenging the district court's March 29, 2004 order granting Dickey-Bey's motion to suppress. *See* 18 U.S.C. § 3731.

II

Because the district court addressed and determined the legality of Dickey-Bey's arrest as important to its determination of whether the search of Dickey-Bey's automobile was legal, we will begin with Dickey-Bey's arrest. Inasmuch as the district court's findings of fact relevant to these determinations are not challenged on appeal, we review its determinations *de novo*. *See Ornelas v. United States*, 517 U.S. 690, 699 (1996).

It is well-settled under Fourth Amendment jurisprudence that a police officer may lawfully arrest an individual in a public place without a warrant if the officer has probable cause to believe that the individual has committed, is committing, or is about to commit a crime.[2] *See*, *e.g.*, *Maryland v. Pringle*, 124 S. Ct. 795, 799 (2003); *United States v. Humphries*, 372 F.3d 653, 657 (4th Cir. 2004). "'[P]robable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979).

Probable cause is judged by an analysis of the totality of the circumstances, *see Illinois v. Gates*, 462 U.S. 213, 230 (1983), which are weighed "not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement," *id.* at 232. Under this pragmatic, common sense approach, we defer to the expertise and experience of law enforcement officers at the scene. *See Ornelas*, 517 U.S. at 699. At bottom, the proper standard is intended

---

[2]If the crime is a misdemeanor, however, it must be committed in the officer's presence. *See Atwater v. Lago Vista*, 532 U.S. 318, 354 (2001).

to protect "citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime," while at the same time giving "fair leeway for enforcing the law in the community's protection." *Pringle*, 124 S. Ct. at 799 (quoting *Brinegar v. United States*, 338 U.S. 160, 176 (1949)) (internal quotation marks omitted). And it is a "fluid concept" that turns on "the assessment of probabilities," not on any formula such as is applied to proof at trial. *Gates*, 462 U.S. at 232. Thus, "even 'seemingly innocent activity' may provide a basis for finding probable cause." *Porterfield v. Lott*, 156 F.3d 563, 569 (4th Cir. 1998) (quoting *Taylor v. Waters*, 81 F.3d 429, 434 (4th Cir. 1996)).

Dickey-Bey contended below and argues to us on appeal that there was no probable cause for his arrest because there was no indication that he had any knowledge of the illegal contents of the sealed package containing cocaine. He contends that "if there was probable cause to arrest [him], then there would also be probable cause to arrest the UPS courier who transported the box prior to . . . and after its arrival in Maryland."

The government contends that probable cause in this case was provided by the contextual facts known to the officers at the time they arrested Dickey-Bey. The officers knew that Dickey-Bey possessed a sealed package containing two kilograms of cocaine and that:

> (1) a significant amount of cocaine had [otherwise] been shipped to Maryland from California; (2) . . . the unknown sender in California had chosen to divide the total amount of cocaine shipped into at least four separate parcels; and (3) Dickey-Bey although not the lessee of the mailbox or the addressee was an individual who had on occasion previously picked up items at [Mail Boxes Etc.] from the mailbox to which one of the parcels was addressed.

After examining each of the factors advanced by the government, the district court agreed with Dickey-Bey and concluded that each factor relied on by the government was insufficient to provide probable cause. At bottom, the court was troubled by the fact that under the facts known to the arresting officers, Dickey-Bey could simply have been an innocent courier sent to pick up mail.

In reaching its conclusion, however, the district court failed to step back and look at the totality of the circumstances and the reasonableness of the officers' belief, in light of those circumstances, that Dickey-Bey was a knowing part of a larger drug operation. Although it might sometimes prove useful to conduct a *separate* analysis of each fact presented and to determine whether it contributes to a finding of probable cause, such a fractured approach in this case led, as it often does, to an aggregation of individual conclusions of insufficiency, prompting the court to conclude that the overall conduct was seemingly innocent activity. *See Porterfield*, 156 F.3d at 569. In this same vein, Dickey-Bey argues to us that if there is probable cause to arrest one who picks up a sealed package containing cocaine, then there is probable cause to pick up any innocent citizen who picks up mail or a package containing contraband. Of course, his syllogism is a correct one as far as it goes, but it fails to take into account the totality of the circumstances that led the police officers in this particular case to arrest Dickey-Bey.

The facts known to the officers before Dickey-Bey's arrest revealed a sophisticated, well-planned series of transactions, involving hundreds of thousands of dollars of cocaine. Each package involved — and at the time of Dickey-Bey's arrest, the officers had learned of four — had the anonymous return address of a UPS retail store in Los Angeles; each was shipped to a box number at a different Baltimore-area store, thereby diffusing the risk and deflecting the suspicion that might have arisen had the packages been sent in a collection to one location; and each box was packaged and transmitted as a shipment of hair gel to phantom businesses at mailboxes registered to "Lisa Ruiz." The package held by Dickey-Bey at the time of his arrest was sent to "Special Design, Box 187." The nature of the packaging was systematic and consistent: Each package was filled with tubs of hair gel, and each tub was filled with a plastic-wrapped block of cocaine weighing one-half kilogram with a street value of approximately $12,500. These facts suggest the existence of a careful and clever operation dealing in large quantities of cocaine. *In assessing probabilities*, an experienced officer would conclude that the person designated to pick up the packages was likewise part of the well-planned operation. It would have made little sense for a large, sophisticated operation to go to the lengths and organization demonstrated in this case and then casually to commit the pickup of some $200,000

worth of drugs to an unknown, uninformed, and perhaps untrustworthy courier. To the contrary, such an operation would likely have sent someone known to be trustworthy to pick up the packages and likewise would have insisted that the packages be picked up promptly, as Dickey-Bey did in this case.

That Dickey-Bey could reasonably be believed to be part of the conspiracy was reinforced by the evidence provided by the Mail Boxes Etc. employee who on September 24 identified Dickey-Bey as the same person who had regularly picked up packages from Box 187. While it certainly was *possible* that the person retrieving the cocaine was one totally innocent of the whole operation, all that is at issue is *the reasonableness of the officers' belief* that just as Box 187 was selected as a drug distribution mailbox, the one who customarily called on it was likewise selected as part of a coordinated operation. This was further indicated by the fact that Dickey-Bey arrived promptly to pick up the package, about one hour after the promised delivery time of 10:30 a.m. In short, the evidence known to police officers leading to Dickey-Bey's arrest reasonably justified their belief that Dickey-Bey was part of the larger, illegal operation.

As the government summarized in its argument to the district court to justify Dickey-Bey's arrest, the officers on the scene knew (1) that the operation was conducted with overall sophistication; (2) that significant quantities of cocaine with a high value were being shipped from California by next-day air to Baltimore; (3) that the packages' disguise indicated a level of planning consistent with "more than just a fly-by-night kind of operation"; (4) that the multiple packages were sent to multiple locations; (5) that at least one of the targeted mailboxes was rented by a woman but that a man who had been picking up packages from the box came to pick up the package on the day of the arrest; and (6) that Dickey-Bey arrived "just about an hour after the package was supposed to arrive at the particular location." We would add to the government's list the facts that because Dickey-Bey repeatedly picked up from Box 187, it would have been unlikely for a well-planned operation to have used a box served by one person without that person having been involved; that Box 187 had apparently been designated by a coordinated operation to serve as a distribution point for a large quantity of drugs; and that the similarity with which each box was packaged and the high value of cocaine involved

pointed to a larger coordinated effort that would have been inconsistent with a single innocent pickup of mail by an unknowing courier.

When "viewed from the standpoint of an objectively reasonable police officer," *Ornelas*, 517 U.S. at 696, and "as understood by those versed in the field of law enforcement," *Gates*, 462 U.S. at 232, the circumstances presented to the officers in this case supported their reasonable belief that Dickey-Bey was involved in a conspiracy for the distribution of cocaine.

That Dickey-Bey might have evidence to present at trial to prove his innocence or to establish a defense does not bear on the question of whether officers acted reasonably in arresting him. In the totality of the circumstances, Dickey-Bey's "seemingly innocent activity" of picking up a sealed package from a Mail Boxes Etc. store was but one of many facts causing the officers to believe that he was part of a larger operation. *See Porterfield*, 156 F.3d at 569. And because Officer Kriete had probable cause to believe that Dickey-Bey was a member of a drug distribution conspiracy, he was authorized to arrest him without a warrant. *See United States v. Watson*, 423 U.S. 411, 423-24 (1976).

## III

The district court concluded that because Dickey-Bey's arrest was illegal, the search of Dickey-Bey's automobile was likewise illegal inasmuch as it was not incident to a lawful arrest. Alternatively, the court concluded that even if probable cause existed to justify Dickey-Bey's arrest, the search of his automobile was "too attenuated" to be a valid search incident to an arrest under *New York v. Belton*, 453 U.S. 454 (1981). In *Belton*, the Supreme Court held that police officers may search the passenger compartment of an automobile contemporaneously with the lawful custodial arrest of the automobile's occupant without the requirement of a separate probable cause for the search. *Id.* at 460. And last term, the Supreme Court concluded that *Belton* also applies to vehicle searches incident to arrest "when an officer does not make contact until the person arrested has left the vehicle." *Thornton v. United States*, 124 S. Ct. 2127, 2129 (2004). The *Thornton* Court, however, specifically declined to reach the issue of whether *Belton* is limited "to 'recent occupants' who are within

'reaching distance' of the car," since petitioner Thornton "was in 'close proximity, both temporally and spatially' to his vehicle when he was approached by [law enforcement officers]." *Id.* at 2132 n.2 (quoting *United States v. Thornton*, 325 F.3d 189, 196 (4th Cir. 2003)).

In this case, the district court concluded that Dickey-Bey's arrest occurred "some 30 feet or more" from his vehicle approximately 15 minutes after he was first taken down as part of his arrest and that these facts did not justify the application of *Belton* and *Thornton*.

We need not, however, decide whether the search of Dickey-Bey's automobile was properly incident to his arrest because we conclude that the circumstances in this case provided officers independent probable cause to search the automobile. *See United States v. Ross*, 456 U.S. 798, 825 (1982) (reiterating that a warrant is unnecessary for an automobile search supported by probable cause). This probable cause was provided by (1) the facts that supported Dickey-Bey's arrest; (2) the additional facts supplied by Detective Martin to fellow officers while they were arresting Dickey-Bey, that Dickey-Bey had arrived in the brown Dodge automobile and that he had backed it into a parking space in unlikely circumstances; and (3) the district court's finding "as a matter of fact and as a matter of law, . . . [that] there was certainly probable cause to believe that Mr. Dickey-Bey was going to put th[e] box in his vehicle and that he was going to get in that vehicle."

Thus, the police officers had probable cause to believe that Dickey-Bey was involved in a drug conspiracy, which included his retrieval of packages from rental boxes, and that as part of this conspiracy Dickey-Bey had arrived in a brown Dodge Daytona automobile that he used and intended to use in furtherance of the conspiracy. Accordingly, the officers had probable cause to believe that the automobile was an instrumentality of the crime. *See*, *e.g.*, *United States v. Patterson*, 150 F.3d 382, 386 (4th Cir. 1998) (concluding "that a vehicle which has been used in a robbery may be seized without a warrant as evidence or as an instrumentality of a crime, particularly when it is parked on a public street"). Viewing the totality of the circumstances, therefore, we conclude that the officers had probable cause to search

Dickey-Bey's vehicle without a warrant under the automobile exception. *See Ross*, 456 U.S. at 825.

*REVERSED AND REMANDED FOR FURTHER PROCEEDINGS*